**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **SAMMY PRICE AKA** | § | |
| **SAMMY SEAUXLEAUX #1423812** | § | |
| | § | |
| **V.** | § | **A-06-CA-832-SS** |
| | § | |
| **AUSTIN POLICE DEPARTMENT,** | § | |
| **CITY OF AUSTIN, RICHARD DAVIS** | § | |
| **#5172, CHRIS VALLEJO #2662, AND** | § | |
| **OFFICERS AT TRAVIS COUNTY JAIL** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE SAM SPARKS
       UNITED STATES DISTRICT JUDGE

The Magistrate Court submits this Report and Recommendation to the District Court
pursuant to 28 U.S.C. § 636(b) and Rule 1(f) of Appendix C of the Local Court Rules of the United
States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to
United States Magistrates Judges, as amended, effective December 1, 2002.

Before the Court are Plaintiff's complaint brought pursuant to 42 U.S.C. § 1983 (Document
No. 1); Plaintiff's more definite statement (Document No. 7); the Motion to Dismiss filed by the City
of Austin on behalf of the Austin Police Department (Document No. 10); the Motion for Summary
Judgment, filed by Defendants the City of Austin, Davis and Vallejo (Document No. 25); Plaintiff's
response thereto (Document No. 29); and the reply, filed by Defendants the City of Austin, Davis
and Vallejo (Document No. 32). Plaintiff, proceeding pro se, has been granted leave to proceed in
forma pauperis.

## I. BACKGROUND

At the time he filed his complaint, Plaintiff was confined in the Travis County Correctional Complex ("TCCC").  He has since been transferred to the Travis State Jail.  Plaintiff files this action pursuant to 42 U.S.C. § 1983 alleging he was falsely arrested.  Plaintiff alleges police officers forced Plaintiff out of his home at gunpoint and without an arrest warrant and seized him.  (Pl. Compl. at 4).  Subsequently, the officers allegedly found a knife on the "so called victims" property without a search warrant.  (Id.).

According to Plaintiff, the "so called victims" were trying to burglarize Plaintiff's neighbor's residence, Apartment D, when Plaintiff caught them.  (Id. at 6).  Plaintiff explains he resided in Apartment C.  Plaintiff believes the "so called victims" made up a story to have Plaintiff arrested. (Id.)  Plaintiff contends had the police officers conducted a proper investigation, they should have realized the truth.  (Id. at 9).

Plaintiff complains the arresting officers took him to jail without allowing him to get a shirt and shoes and to lock his doors and without reading Plaintiff the Miranda warnings.  (Id. at 8).  After arriving at the jail, Plaintiff alleges he was in an altercation and was wrestled and tasered by three or four officers.  (Id.)  Plaintiff states he never resisted.  (Id. at 9).  After Plaintiff threatened to tell Internal Affairs, Plaintiff alleges false charges were brought against him and he was booked into jail under a false name.  (Id.).

Originally Plaintiff sued the Austin Police Department, the City of Austin, unnamed arresting officers, unnamed officers at the Travis County Jail, and other unnamed officers located downtown. He seeks an unspecified amount of monetary damages.

Because of the confusing nature of Plaintiff's complaint, he was ordered to file a more definite statement, specifying what acts each defendant did to violate his constitutional rights. Plaintiff was also ordered to identify the officers he intended to sue.  Plaintiff indicated the officers he intended to sue were Officer Richard Davis #5172 and Detective Chris Vallejo #2662. (Pl. MDS at 2).  Accordingly, the Court ordered Davis and Vallejo substituted for the defendants previously identified as "arresting officers."

In his more definite statement Plaintiff repeats that he was arrested illegally and he was taken to jail without being permitted to secure his property, allowing his home to be ransacked and robbed. (Id.).  Plaintiff further alleges the officers maliciously prosecuted him by giving him a false name and not asking for any information as to whom Plaintiff was, which prevented Plaintiff from making bail. (Id. at 3).

Plaintiff also alleges, after he was taken downtown, he was tasered he thinks in the groin/testicles area and for sure on his spinal column.  (Id.).  He states he has recurring problems with this testicles and back.  (Id.).

In a document entitled "Conclusion to Retaliation Affidavit," filed on January 3, 2007, Plaintiff indicates he also intended to name as defendants Officer Scott Truho and Nurse Kirsten Lotter.  (Pl. Concl. to Retal. Aff. at 5).  However, he has never requested leave to amend his complaint to name these individuals as defendants.  Moreover, his allegations do not support his conclusion that his constitutional rights were violated by these individuals.

It appears that the purpose of Plaintiff's "Conclusion to Retaliation Affidavit" is to dissect the Affidavit for Warrant of Arrest and Detention for the charge of Retaliation and point out alleged discrepancies in the affidavit.  Plaintiff also explains the reason he snatched his left hand away

3

during fingerprinting was that it had previously been broken.  (Id. at 1).  Plaintiff asserts he was knocked to the floor before he could get any words out.  (Id.).  Plaintiff denies saying if he were released the police would have to come back for murder.  (Id. at 4).  Plaintiff clarifies he said the police might be back for murder because everyone knows his neighbor was a woman beater.  (Id.).  Plaintiff also states he seeks damages for mental anguish because his daily routine has been disrupted.  (Id. at 6).

The Court ordered Defendants City of Austin, Officer Davis and Officer Vallejo to answer Plaintiff's complaint.  The City of Austin has filed a Motion to Dismiss on behalf of the Austin Police Department, arguing the police department is not an entity capable of being sued.

The City of Austin, Officer Davis and Officer Vallejo have answered and move for summary judgment.  They explain on June 18, 2006, at approximately 12:41 a.m., 9-1-1 emergency service personnel received a call from an individual, initially identified as "Sammy Solo," residing at 6901 Wentworth Drive, Apt. C, Austin, Texas 78724.  (Def. Exh. A, Attachments 2 and 3).  During the call, Plaintiff reported he had been in a fight with his neighbor and that his neighbor had fired gunshots into Plaintiff's apartment.  (Id.).  Plaintiff, using profanity, also threatened to kill his neighbor several times during the call.  (Id.).  On the Incident Detail Report, the 9-1-1 dispatcher noted that Plaintiff spoke with slurred speech.  (Def. Exh. A, Attachment 3).  The 9-1-1 operator dispatched Defendant Davis and Defendant Vallejo to the scene.  (Id.).  According to Defendants, the dispatcher informed Davis and Vallejo that she had received a report of shots fired and that the complainant sounded intoxicated.  (Def. Exh. A, ¶ 8; Exh. B, ¶ 4).

Defendants further explain Davis, a patrol officer in the Austin Police Department, was the first to arrive on the scene.  (Def. Exh. A, ¶ 9).  Defendants assert Davis was in uniform and arrived

in a marked patrol car.  (Id.).  Davis allegedly was met by an individual identifying himself as Frank Mathews.  (Id.).  Mathews allegedly told Davis that he resided at 6903 Wentworth Drive, Apt. B. (Id.).  Davis learned from Mathews that earlier in the evening, Plaintiff verbally confronted Mathews and his fiancee by yelling obscenities at them and threatening to kill them.  (Def. Exh. A, ¶ 9, Attachment 5).  Davis also learned that after the initial verbal confrontation, Plaintiff went into his residence, located adjacent to that of Mathews and across a small privacy fence.  (Id.).  Mathews informed Davis soon thereafter, Plaintiff began breaking bottles in front of his own residence and throwing the broken bottles over the fence at Mathews' front door.  (Id.)  Mathews also told Davis that Plaintiff escalated his verbal threats by threatening to kill Mathews and his fiancee.  (Id.). Mathews told Davis he attempted to defuse the situation, but Plaintiff again went into his residence and returned with knives in his hands.  (Id.).  Davis learned that Plaintiff continued to make threats of violence against Mathews and his fiancee.  After Mathews and his fiancee returned into their home, Plaintiff allegedly began banging on their doors and windows and continued making threatening statements.  (Id.).

Defendants assert, after speaking with Mathews, Davis began to investigate the area in an attempt to verify the events that Mathews had described.  (Def. Exh. A, ¶ 11).  Davis observed broken glass and bottles in the area around Mathews' front door, which was wet with alcohol.  (Id.). He also stated he located an 8" serrated knife with a wooden handle near the privacy fence that separated Mathews' residence from Plaintiff's residence.  (Id.).  Mathews confirmed to Davis that the bottles had been thrown by Plaintiff and that the knife Davis found had been brandished by Plaintiff.  (Def. Exh. A, ¶ 12).  Davis believed the broken glass and bottles, the wet door, and the

presence of the knife tended to vindicate Mathews' description of the events.  (Def. Exh. A, ¶¶ 11, 13)

After Davis spoke to Mathews, Defendant Vallejo allegedly arrived on the scene.  (Def. Exh. A, ¶ 10).  Davis relayed the pertinent details of Mathews' story to Vallejo and the evidence he found.  (Def. Exh. A, ¶¶ 6-7).  Together, Davis and Vallejo went to Plaintiff's door to attempt to speak with him.  (Def. Exh. A, ¶ 13; Exh. B ¶ 8).  Defendants assert they observed more broken glass around Plaintiff's front door.  (Id.).  Prior to knocking on Plaintiff's door, Davis asserts he drew his Taser.  (Def. Exh. A, ¶ 13).  Vallejo asserts he placed his hand on his firearm, but he did not draw it.  (Def. Exh. B, ¶ 8).  According to Defendants, Davis and Vallejo took these precautions because they had earlier been informed that Plaintiff was intoxicated, that shots had been fired, that Plaintiff had made verbal threats of violence, and that Plaintiff had wielded knives.  (Def. Exh. A, ¶ 13; Exh. B ¶ 8).  As soon as Davis knocked on Plaintiff's front door, they assert the lights were turned off inside the apartment and the occupant looked out through the curtains or blinds.  (Def. Exh. A, ¶ 14; Exh. B ¶ 9). After Davis identified himself and Vallejo as the "Police," Plaintiff opened the door.  (Id.).

According to Defendants, Davis ordered Plaintiff out of the apartment with his Taser drawn.  (Id.).  Davis placed Plaintiff in handcuffs and frisked Plaintiff for weapons.  (Id.).  Davis asserts he did not find any weapons on Plaintiff.  (Def. Exh. A, ¶ 14).  Davis and Vallejo allegedly decided to place Plaintiff in the backseat of Davis' patrol car, so they could speak to him and continue their investigation of the scene.  (Def. Exh. A, ¶ 14; Exh. B ¶ 9).  Davis and Vallejo deny drawing their firearms or entering Plaintiff's residence.  (Id.).

According to Defendants, Plaintiff identified himself to Davis and Vallejo as Sammy Seauxleaux.  (Def. Exh. A, ¶ 15; Exh. B ¶ 10).  Defendants assert Plaintiff did not have any

identification.  (Id.).  Plaintiff allegedly told Davis and Vallejo that Mathews had instigated the entire confrontation.  (Id.).  Davis and Vallejo assert Plaintiff exhibited signs of heavy intoxication and made multiple threats of violence against the police and Mathews.  (Id.).  According to Davis and Vallejo, Plaintiff told them the police would have to return for a murder if they let him go.  (Id.).  Mathews and his fiancee identified Plaintiff as the individual who had threatened them, thrown bottles and brandished knives.  (Def. Exh. A, ¶ 16; Exh. B ¶ 11).

According to Defendants, at approximately 1:31 a.m., Officer Scott Truho arrived on the scene.  (Def. Exh. C, ¶ 4).  Defendants assert he had been sent by dispatch to provide a camera to Davis.  (Id. at ¶ 3).  While Davis used the camera to take pictures of the scene, Truho observed Plaintiff.  (Def. Exh. A, ¶ 18, Attachment 4; Exh. C, ¶ 4).  He described Plaintiff as loud, belligerent and intoxicated.  (Def. Exh. C, ¶ 5).

After completing his investigation, Davis, on the advice of Vallejo, contacted his supervisor to determine whether he should place Plaintiff under arrest for aggravated assault.  (Def. Exh. A, ¶ 17; Exh. B, ¶ 12).  Upon the advice of his supervisor, Davis asserts he placed Plaintiff under arrest, locked Plaintiff's apartment and transported Plaintiff to Police Headquarters for proper identification prior to taking him to the TCCC.  (Def. Exh. A, ¶¶ 17, 19).  Truho allegedly followed Davis to Police Headquarters, and Vallejo left the scene.  (Def. Exh. A, ¶ 19; Exh. C, ¶ 6; Exh. B, ¶ 15).

While being transported to Police Headquarters, Plaintiff allegedly made a series of threats against Davis.  (Def. Exh. A, ¶ 21).  After arriving at headquarters, Plaintiff continued to make threats against Davis and Truho.  (Def. Exh. A, ¶ 21, Exh. C, ¶ 7).  Specifically, Defendants assert Plaintiff threatened Davis and Truho that he would attack them if they took the handcuffs off of him. (Id.).

According to Defendants, Davis and Truho escorted Plaintiff to the identification section where he could be fingerprinted by a civilian employee. (Def. Exh. A, ¶ 22; Exh. C, ¶ 8, Exh. D, ¶ 2). Defendants explain, because fingerprinting requires all ten fingers to be printed, an arrestee's hands must be freed from handcuffs before he can be fingerprinted. (Def. Exh. D, ¶ 4). Defendants allege on the way into the small fingerprint room, Plaintiff continued to yell and speak in an agitated and belligerent manner. (Id. at ¶ 5). The identification technician attempted to fingerprint Plaintiff, but Plaintiff allegedly struggled and pulled his hand away. (Def. Exh. A, ¶ 23; Exh. C, ¶ 9, Exh. D, ¶ 7). Defendants assert Davis and Truho attempted to place Plaintiff back in handcuffs, but he began to aggressively struggle by raising his arm and shifting his weight in an attempt to throw the officers off him. (Def. Exh. A, ¶¶ 23-24; Exh. C, ¶¶ 8-9, Exh. D, ¶ 8). Davis allegedly warned Plaintiff that if he did not cease struggling and comply, he would deploy his Taser. (Def. Exh. A, ¶ 24; Exh. C, ¶ 10, Exh. D, ¶ 10). Despite the warning, Plaintiff allegedly continued to resist, and Davis deployed his Taser. (Id.). According to Defendants, Plaintiff dropped to the floor, and Davis and Truho were able to place handcuffs on Plaintiff. (Def. Exh. A, ¶ 24; Exh. C, ¶ 10, Exh. D, ¶ 11). Plaintiff was then transported to TCCC for intake. (Def. Exh. A, ¶ 26). After arriving at TCCC, Defendants assert Plaintiff was taken to the infirmary, where he was examined by registered nurse. (Id. at ¶ 28). Defendants assert, when the nurse asked Plaintiff if he wanted to hurt himself, he responded that he did not want to hurt himself but he intended to kill Davis. (Id.). After leaving Plaintiff at TCCC, Davis completed sworn affidavits for both the Aggravated Assault charge and the Retaliation charge against Plaintiff. (Id. at ¶ 30, Attachments 5-6).

Defendants move for summary judgment and assert their entitlement to qualified immunity. First, they argue Davis and Vallejo did not falsely arrest Plaintiff. They point out the facts of

Plaintiff's arrest were placed before the grand jury and Plaintiff was indicted for both Aggravated Assault and Retaliation. They also assert Davis, not Vallejo, was the arresting officer, and Davis had probable cause to arrest Plaintiff.

Next, Defendants argue they were justified in checking Plaintiff for weapons. They repeat Plaintiff's neighbor told them Plaintiff had made a number of verbal threats, had thrown broken bottles at his door and had threatened him and his fiancee with knives. Davis reasserts he had located a knife and broken glass on the scene and Plaintiff had reported to 9-1-1 that gun shots had been fired. Defendants deny any search of Plaintiff's apartment.

Defendants also deny using excessive force on Plaintiff during his arrest. They deny pointing their firearms at him when Plaintiff opened the door to his residence. They also argue Plaintiff has not alleged he suffered any injury.

With respect to Plaintiff's claim of excessive force during his fingerprinting, Defendants argue Plaintiff has no evidence to support his allegation that he suffered an injury to his back or testicles or that the alleged injury is more than de minimis. Alternatively, Defendants argue Davis' use of force was objectively reasonable because Plaintiff was intoxicated, had been making threats against Davis and others, had threatened to attack the officers when released from handcuffs, and violently struggled when he was released from his handcuffs in the fingerprint room. Additionally, they assert the force was objectively reasonable because Plaintiff exhibited considerable strength when resisting and Davis feared if he did not get Plaintiff under control quickly he could pose a danger to nearby civilian employees. Moreover, Davis allegedly believed that other methods of re-gaining control over Plaintiff would not have been as safe or effective as the Taser due to the size of the room. Overall, they argue they acted reasonably under the circumstances.

9

Next, Defendants argue Plaintiff does not have a cognizable claim for malicious prosecution. Similarly they argue Plaintiff does not have a constitutional claim for the alleged failure to lock Plaintiff's doors.

With respect to Plaintiff's claims against the City of Austin, Defendants argue a municipality may not be found liable under Section 1983 when it is found that no constitutional violation took place.  Additionally, they argue municipal liability cannot be based on a theory of respondeat superior.  They point out Plaintiff's pleadings do not identify any policymaker, any official policy, practice or custom, or any theory on which an official policy caused the alleged constitutional violations.

Plaintiff responds in a "Motion to Proceed to Trial," file-marked on March 19, 2007.  He indicates the defendants he originally identified as "unnamed officers at the Travis County Jail" are Scott Truho and Amy Stephenson, the fingerprint technician at police headquarters.  (Pl. Resp. at 1). Again, Plaintiff  never requested leave to amend his complaint to name these individuals as defendants.  Moreover, his allegations do not support his conclusion that his constitutional rights were violated by these individuals.

In his response Plaintiff provides his own statement of facts.  (Pl. Resp. at 3).  He states on June 18, 2006, about 12:00 a.m. Plaintiff saw two shadows, Mathews and his fiancee, at his next door neighbor's apartment.  (Id.).  Plaintiff states he questioned them and saw Mathews with a knife, the same knife Plaintiff was accused of using to threaten Mathews.  (Id.).  Plaintiff believed they were trying to break into his neighbor's apartment and warned Mathews and his fiancee that they better not let Plaintiff catch them on the property again or Plaintiff would see to it that he'd "cutt [sic] their heads open & 'then!' call the police."  (Id.).  Plaintiff claims he walked away as Mathews

10

swore at him.  (Id.).  Plaintiff admits he responded with additional obscenities.  (Id.).  Shortly

thereafter, Plaintiff states he heard a loud smash at his back door and a loud pop and smashing

sound.  (Id.).  He believed his back window had been shot out, and he called 9-1-1.  (Id. at 4).

Plaintiff admits he made threats during the 9-1-1 call and explains he thought police would respond

sooner.  (Id.).  When police arrived, Plaintiff states he opened his door, thinking he would be making

a police report about his neighbor, but was instead ordered outside at gunpoint.  (Id.).  Plaintiff

asserts he was frisked and handcuffed.  (Id.).  He repeats he was not allowed to get a shirt and shoes

and was not allowed to lock his door.  (Id. at 5).  Plaintiff refutes the statements allegedly made by

Mathews to Davis.  Plaintiff claims it would have been illogical for Plaintiff to have threatened

Mathews with bottles and knives when Mathews was shooting at his house with a gun.  (Id. at 6).

Plaintiff also suggests the damage to Mathews' door was caused, not by the plaintiff, but by police

officers responding to calls in the past.  (Id. at 7).  Plaintiff complains that the police failed to

investigate his shot out window.  (Id. at 7).  Plaintiff also suggests the broken bottles, which were

photographed by Davis, were not in front of Mathews' door, but were found two apartments over.

(Id. at 8).  Plaintiff questions why he should be considered a suspect when he is the one who called

9-1-1.  (Id. at 11).  Plaintiff denies he ever assaulted anyone.  (Id.).

    Plaintiff also asserts, if he was belligerent, it was because Davis arrested him.  Plaintiff also

states Davis could not have locked his doors without a key because he had deadbolt locks.  (Id. at

12).  Plaintiff appears to deny threatening to kill Davis.  (Id. at 16).  He does, however, admit to

calling Davis an idiot flat foot and a stupid beat cop that arrested the wrong person and to stating that

he considered Mathews and his fiancee Davis' flunkies or snitches.  (Id.).

11

Plaintiff provides multiple photographs to disprove the allegations made by Mathews to Davis.   The photographs contain extensive notations.   Plaintiff questions why Davis never photographed the location of the knife he claimed to have found in the victims' yard or why the knife was not processed for fingerprints.

Defendants contend Plaintiff's response was untimely filed.  Plaintiff's response was due on or before March 16, 2007.  Plaintiff's response was executed on March 12, 2007.  Plaintiff's response is considered filed on the date he placed his response in the hands of prison authorities for mailing and not on the date the Court actually received the response.  As such, Plaintiff's response was timely filed.

Defendants also object to Plaintiff's photographs submitted with his response.  Defendants argue the photographs are inadmissible and should be stricken from the summary judgment record.  Defendants note they were not provided copies of the photographs and argue the photographs are inadmissible hearsay evidence.  Defendants point out that Plaintiff fails to identify who took the photographs, state when the photographs were taken or claim that the photographs are business records or fall into some other hearsay exception.  After consideration of the photographs submitted by Plaintiff in response to Defendants' Motion for Summary Judgment and Defendants' objections thereto, the photographs will not be excluded from the summary judgment evidence presented in this case.

Defendants also object to Plaintiff's unsworn factual averments and conclusory allegations.  Defendants maintain Plaintiff's allegations are not competent summary judgment evidence and should not be considered by the Court.  Defendants also contend Plaintiff has failed to raise an issue of material fact with respect to his claims against the defendants.

## II. ANALYSIS

A.    Standard Under 28 U.S.C. § 1915(e)

An in forma pauperis proceeding may be dismissed sua sponte under 28 U.S.C. § 1915(e) if the court determines the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief against a defendant who is immune from suit.  A dismissal for frivolousness or maliciousness may occur at any time, before or after service of process and before or after the defendant's answer.  Green v. McKaskle, 788 F.2d 1116, 1119 (5th Cir. 1986).

When reviewing a plaintiff's complaint, the court must construe plaintiff's allegations as liberally as possible. Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594 (1972).  However, the petitioner's pro se status does not offer him "an impenetrable shield, for one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation and abuse already overloaded court dockets."  Farguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986).

B.    Entities Not Capable of Being Sued

The Austin Police Department is not a legal entity capable of being sued.  See, Guidry v. Jefferson County Detention Center, 868 F. Supp. 189, 191 (E.D. Tex. 1994) (holding that the Jefferson County Detention Center is not a legal entity subject to suit); Darby v. Pasadena Police Dep't, 939 F.2d 311 (5th Cir. 1991) (holding that police and sheriff's departments are governmental subdivisions without capacity for independent legal action).  Therefore, the Motion to Dismiss filed on behalf of the Austin Police Department should be granted.

C.    Standard of Review Under Fed. R. Civ. P. 56(c)

Defendants the City of Austin, Davis, and Vallejo move for summary judgment.  A court will, on a motion for summary judgment, render judgment if the evidence shows that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996);  Int'l Shortstop, Inc. v. Rally Inc., 939 F.2d 1257, 1263 (5th Cir. 1991), cert. denied, 502 U.S. 1059, 112 S. Ct. 936 (1992).  When a motion for summary judgment is made and supported, an adverse party may not rest upon mere allegations or denials but must set forth specific facts showing there is a genuine issue for trial.  Ray v. Tandem Computers, Inc., 63 F.3d 429, 433 (5th Cir. 1995);  Fed. R. Civ. P. 56.

Both movants and non-movants bear burdens of proof in the summary judgment process. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986).  The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense.  Id. at 322, 106 S. Ct. at 2552.  In so doing, the moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses.  Id. at 323-24, 106 S. Ct. at 2554.  At that point, the burden shifts to the non-moving party to "produce evidence in support of its claims or affirmative defenses . . . designating specific facts showing that there is a genuine issue for trial."  Id. at 324, 106 S. Ct. at 2553.  The non-moving party must produce "specific facts" showing a genuine issue for trial, not mere general allegations.  Fed. R. Civ. P. 56(e);  Tubacex v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party.  The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court."  James v. Sadler, 909 F.2d 834, 837 (5th Cir. 1990) (citing Matsushita, 475 U.S. at 586, 106 S. Ct. 1356)).

14

To the extent facts are undisputed, a Court may resolve the case as a matter of law.  Blackwell v. Barton, 34 F.3d 298, 301 (5th Cir. 1994).  Evidence based on hearsay is inadmissible and may not be considered on summary judgment.  Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995).

        D.     Qualified Immunity

Defendants Davis and Vallejo assert their entitlement to qualified immunity.  The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982).  Immunity in this sense means immunity from suit, not merely from liability. Jackson v. City of Beaumont, 958 F.2d 616 (5th Cir. 1992).  "Qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who violate the law." Brady v. Fort Bend County, 58 F.3d 173, 174 (5th Cir. 1995).  In general, "qualified immunity represents the norm." Id.  With respect to a ruling on qualified immunity, the first question a court should address is "whether the plaintiff has alleged a violation of a clearly established constitutional right." Siegert v. Gilley, 500 U.S. 226, 231, 111 S. Ct. 1789 (1991); Hale v. Townley, 45 F.3d 914, 917 (5th Cir. 1995).  If the Plaintiff has alleged a constitutional violation, the court must then determine whether the defendant's conduct was objectively reasonable under legal principles as they existed at the time of the defendant's acts or omissions. Hale, 45 F.3d at 917, citing Brewer v. Wilkinson, 3 F.3d 816, 820 (5th Cir. 1993), cert. denied, 510 U.S. 1123, 114 S. Ct. 1081 (1994); Spann v. Rainey, 987 F.2d 1110, 1114 (5th Cir. 1993).

Claims of qualified immunity require a two step analysis.  As a threshold matter, the court must consider whether the facts alleged, taken in the light most favorable to the party asserting the

injury, show that the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001); Glenn v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001).  If the allegations do not establish the violation of a constitutional right, the official is entitled to qualified immunity.  Saucier, 533 U.S. at 201, 121 S. Ct. at 2156.  If the allegations could make out a constitutional violation, the court must ask whether the right was clearly established – that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202, 121 S. Ct. at 2156.  If an official makes a reasonable mistake as to what the law requires, the officer is entitled to immunity.  Id. at 205, 121 S. Ct. at 2158.  With these principles in mind, the Court will address the issue of Defendants' qualified immunity.

      E.     False Arrest

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ."  U.S. CONST. amend. IV.  By its plain terms, the Fourth Amendment does not prohibit all searches and seizures – only those that are "unreasonable."  Illinois v. Rodriguez, 497 U.S. 177, 183, 110 S. Ct. 2793, 2799 (1990); Bell v. Wolfish, 441 U.S. 520, 558, 99 S. Ct. 1861, 1884 (1979).  To establish a constitutional violation based on false arrest, Plaintiff must show the arresting officers did not act with probable cause.  Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001) (explaining that persons enjoy the constitutional right to be free from false arrest without probable cause); Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001) (same).  Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." Glenn

v. City of Tyler, 242 F.3d 307, 313 (5th Cir. 2001) (quoting Spiller v. Texas City, 130 F.3d 162, 165 (5th Cir. 1997)).

Once "facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest." Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994) (citing Wheeler v. Cosden Oil & Chem. Co., 744 F.2d 1131, 1132 (5th Cir. 1984)). False arrest claims may nevertheless be maintained if the plaintiff affirmatively shows that "the deliberations of that intermediary were in some way tainted by the actions of the defendants." Taylor, 36 F.3d at 457 (quoting Hand v. Gary, 838 F.2d 1420, 1427 (5th Cir. 1988)).

In this case the summary judgment evidence shows Plaintiff was indicted for both Aggravated Assault and Retaliation. Plaintiff does not allege, much less affirmatively show, the grand jury deliberations were tainted. Plaintiff's false arrest claim should be dismissed as the requisite chain of causation was broken by the grand jury's indictments. See Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994) ("It is well settled that if facts supporting an arrest are put before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party.") and Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982) ("Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest. Such an arrest is not unconstitutional, and a complaint based on such an arrest is subject to dismissal for failure to state a claim.") (citation omitted).

17

F.     Unlawful Search

The Court is not certain whether Plaintiff is alleging an independent claim of unlawful search. In their summary judgment motion Defendants admit Plaintiff was patted down upon exiting his residence. However, they deny ever entering Plaintiff's residence.

A law enforcement officer may conduct a limited search of a subject for weapons if he reasonably believes that the suspect may be armed and dangerous. Terry v. Ohio, 392 U.S. 1, 29, 88 S. Ct. 1868, 1884 (1968). Terry does not limit a weapons search to a pat-down search. United States v. Reyes, 349 F.3d 219, 225 (5th Cir. 2003). Any limited intrusion designed to discover guns, knives, clubs or other instruments of assault are permissible. Id.

As explained by Defendants, a suspect may be subjected to a Terry detention, or even a warrantless arrest based on probable cause from his doorway. The threshold or doorway to one's household, for purposes of the Fourth Amendment, is a public place where there is no expectation of privacy. United States v. Santana, 427 U.S. 38, 42 (1976). The Fifth Circuit has held that a warrantless arrest, based on probable cause, may occur in a suspect's doorway. Kirkpatrick v. Butler, 870 F.2d 276, 280 (5th Cir. 1989). Furthermore, although the Fifth Circuit has not directly considered the issue, both the Second and Ninth Circuits have held that officers who have reasonable suspicion of criminal activity may conduct a Terry stop of a suspect in his doorway. United States v. Gori, 230 F.3d 44, 53 (2nd Cir. 2000); United States v. Crapser, 472 F.3d 1141, 1148 (9th Cir. 2007) (holding that when a suspect voluntarily opens the door in response to a "knock and talk" he may be subjected to a Terry stop in his doorway).

In the present case, Defendants Davis and Vallejo learned from Mathews that his neighbor, whom he knew as "Sammy," had made a number of verbal threats, had thrown broken bottles at his

18

door, and had threatened him and his fiancee with knives.  (Def. Exh. A, ¶ 9; Exh. B, ¶¶ 6-7).   The 9-1-1 call had also reported shots fired.  Defendant Davis located a knife and broken glass on the scene.  (Def. Exh. A, ¶ 11).  As they approached Plaintiff's door to conduct a "knock and talk," Officers Davis and Vallejo also saw broken glass around Plaintiff's door.  (Def. Exh. A, ¶ 13; Exh. B, ¶ 8).  When they knocked on his door, Plaintiff quickly turned off the lights in his apartment. (Def. Exh. A, ¶ 14; Exh. B, ¶ 9).  Furthermore, when Defendants Davis and Vallejo made the decision to detain Plaintiff and search him for weapons, they knew that Plaintiff, who sounded intoxicated, had called 911 reporting gun shots.  (Def. Exh. A, ¶ 8; Exh. B, ¶ 4).  All of these factors gave Defendants Davis and Vallejo at least a reasonable suspicion that Plaintiff was involved in criminal activity.   Accordingly, the limited protective pat-down did not violate Plaintiff's constitutional rights, and there is absolutely no credible summary judgment evidence indicating the officers entered Plaintiff's residence.

> G.    Malicious Prosecution

Plaintiff's complaint is far from clear.  However, he does allege the officers maliciously prosecuted him by giving him a false name and not asking for any information as to whom Plaintiff was, which prevented Plaintiff from making bail.  Malicious prosecution, standing alone, does not state a constitutional violation.  Castellano v. Fragozo, 352 F.3d 939, 945 (5th Cir. 2003) ("[C]ausing charges to be filed without probable cause will not without more violate the constitution.  So defined, the assertion of malicious prosecution states no constitutional claim.").  To the degree Plaintiff is asserting a federal civil rights claim under Section 1983 based on malicious prosecution his claim fails.

H.      Excessive Force

Plaintiff first alleges Defendants Davis and Vallejo used excessive force against him when they allegedly pointed their firearms at him when he opened the door of his residence.  According to Defendant Davis, he drew his Taser before he knocked on Plaintiff's door, because he had information that Plaintiff had been armed with knives, had complained of gunshots being fired,  was intoxicated and was acting in a bellicose and belligerent manner.  (Def. Exh. A, ¶ 13).  Defendant Davis denies drawing his service firearm.  (Def. Exh. A, ¶ 14).  Defendant Vallejo confirms Defendant Davis drew his Taser when they got in front of Plaintiff's door.  (Def. Exh. B, ¶ 8).  According to Defendant Vallejo, he placed his hand on his own service firearm to ready it, but did not draw it.  (Def. Exh. B, ¶ 9).  Plaintiff refutes Defendants' affidavits and states they both drew their weapons.

Claims of excessive force in the course of a seizure are analyzed under the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865 (1989). "To succeed on an excessive force claim [under 42 U.S.C. § 1983], a plaintiff bears the burden of showing (1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable." Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001) (internal quotation marks omitted).  "In gauging the objective reasonableness of the force used," the court "must balance the amount of force used against the need for that force." Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996).

The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments . . . about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396.  Assuming without deciding that the officers pointed their weapons at Plaintiff, Plaintiff's allegations are insufficient to demonstrate a constitutional violation. Johnson v. Deep East Tex. Regional Narcotics, 379 F.3d 293, 305-306 (5th Cir. 2004) (holding district court did not err in granting motion for summary judgment regarding claim that police officers entered the plaintiff's home, had their guns drawn and told the plaintiff to turn her head back around and lay down before she got shot); Hinojosa v. City of Terrell, Tex., 834 F.2d 1223 (5th Cir. 1988) (finding the momentary fear experienced by the plaintiff when a police officer pointed a gun at him did not rise to the level of a constitutional violation).

Plaintiff also alleges excessive force was used against him when he was tasered while he was being fingerprinted after his arrest.  To establish a constitutional violation, inmates raising allegations of excessive force must show that the force used was malicious and sadistic for the very purpose of causing harm rather than in a good faith effort to restore discipline. Hudson v. McMillian, 503 U.S. 1, 6, 112 S. Ct. 995, 998 (1992).  The standard announced in Hudson applies to claims of pretrial detainees.  Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993). The summary judgment evidence shows Defendant Davis' use of his Taser on Plaintiff was objectively reasonable under the circumstances.  As shown by the summary judgment evidence, Plaintiff was intoxicated, had been making threats against Officer Davis and others, had threatened to attack the officers when released from handcuffs, and struggled when he was released from his handcuffs in the fingerprint room.  (Def. Exh. A, ¶¶ 21-24; Exh. C, ¶¶ 6-10; Exh. D, ¶¶ 8-10).  Plaintiff also exhibited considerable strength when resisting and Defendant Davis feared if he did not get Plaintiff under control quickly he cold pose a danger to nearby civilian employees.  (Def. Exh. A, ¶ 23; Exh. C, ¶

9).  Defendant Davis believed that other methods of re-gaining control over Plaintiff would not have been as safe or effective as the Taser due to the size of the room.  (Def. Exh. A, ¶ 24).   Furthermore, Defendant Davis warned Plaintiff to stop resisting, or he would deploy his Taser.  (Def. Exh. A, ¶ 24; Exh. C, ¶ 10; Exh. D, ¶ 10).  Nonetheless, Plaintiff continued to resist.  (Id.).

As set forth above, Defendants have presented competent summary judgment evidence in the form of affidavits and police records concerning the June 18 incident.  Their evidence establishes Plaintiff became disruptive and ignored the orders of officers while he was being fingerprinted. Plaintiff does not deny he was disruptive.  Rather, he explains he pulled his hand away because of a previous injury to his hand.

In this case, Plaintiff has not presented any objective evidence showing he suffered some injury as a result of the June 18 incident.  He does, however, allege he suffers from recurring problems with his back and testicles.  For purposes of this Report and Recommendation the Court assumes without deciding that Plaintiff has suffered an injury.   As such, the first Hudson factor is not conclusive but tends to weigh in Plaintiff's favor.

The second Hudson factor concerns the need for the application of force.  Plaintiff was refusing to comply with orders and was acting in a disruptive manner.  The second Hudson factor weighs strongly against Plaintiff.

The third Hudson factor concerns the relationship between the need and the amount of force used.  The need for the use of force was created by Plaintiff's recalcitrance and disruptive physical behavior.  The evidence presented shows Plaintiff resisted the attempts to fingerprint his left hand and Davis and Officer Truho had a difficult time getting him under control and getting Plaintiff back into handcuffs.  The summary judgment evidence further shows Defendant Davis warned Plaintiff

to stop resisting and instructed him to give the officers his hands so they could place him back in handcuffs.  Plaintiff was warned that if he did not stop resisting, Defendant Davis wold deploy his Taser. The summary judgment evidence shows Defendant Davis acted in an attempt to restore order and discipline.  Such actions do not rise to the level of a constitutional violation unless they involve "unnecessary and wanton infliction of pain." Ingraham v. Wright, 430 U.S. 651, 670, 97 S. Ct. 1401, 1412 (1977).  See  Hudson, 503 U.S. at 7, 112 S. Ct. at 999 (core judicial inquiry focuses on "whether force was applied in a good-faith effort to maintain or restore discipline or malicious and sadistically to cause harm").  Accordingly, the third Hudson factor also weighs against Plaintiff.

The fourth Hudson factor concerns the threat perceived by the officials.  By way of his affidavit Davis makes clear Plaintiff had become disruptive and was resisting the attempts to fingerprint him in the small fingerprint room with a civilian employee.  Plaintiff's physical disruption without doubt poses a threat to the order and security of the jail or booking facility.  Thus, the fourth Hudson factor weighs against Plaintiff.

The fifth Hudson factor concerns efforts made to temper the severity of a forceful response. Defendant Davis has established Plaintiff failed to comply with his orders and refused to allow the officers to recuff him.  Plaintiff continued to resist after being warned that Defendant Davis would deploy his Taser.  Davis employed the drive-stun technique to Plaintiff in his lower right back area. Plaintiff fell to the floor and he was handcuffed.  Plaintiff was then escorted to Davis' patrol car and transported to the Travis County Correctional Center.  Had Plaintiff elected to comply with Davis' orders, the force would not have been necessary. The fifth Hudson factor weighs against Plaintiff.

In sum, after considering the five Hudson factors, the Court concludes Plaintiff has not shown the use of force by Defendant Davis on June 18 was malicious and sadistic for the very

23

purpose of causing harm.  Moreover, courts have held that officers may use a taser devise in various

contexts to subdue a belligerent or unruly arrestee or inmate.  See Draper v. Reynolds, 369 F.3d

1270, 1277-78 (11th Cir. 2004) (holding that a "single use of the taser gun causing a one-time

shocking" against a "hostile, belligerent, and uncooperative" arrestee in order to effectuate the arrest

was not excessive force in the totality of the circumstances); Jasper v. Thalacker, 999 F.2d 353, 354

(8th Cir. 1993) (using a stun gun to subdue an unruly inmate did not violate Eighth Amendment

where plaintiff failed to prove that the officers used the stun gun sadistically or maliciously to cause

harm); Caldwell v. Moore, 968 F.2d 595, 599-602 (6th Cir. 1992) (holding that use of a taser was

not a per se violation of the Eighth Amendment if use of the taser gun is necessary to avoid using

greater force and the use is not with the malicious intent to inflict harm).  Accordingly, the

undersigned concludes Plaintiff has failed to establish a constitutional violation as to the June 18

incident.

      I.        Failing to Lock Door

Plaintiff repeatedly claims that Defendants Davis and Vallejo failed to lock his door

following his arrest.[1]  However, failing to lock an arrestee's door following an arrest is not a

constitutional violation.  Streetman v. Jordan, 918 F.2d 555, 557 n.3 (5th Cir. 1990).

      J.        Miranda

Plaintiff often complains he was not advised pursuant to Miranda.  The Fifth Amendment,

which is applicable to the States through the Fourteenth Amendment, provides that "no person ...

shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V.

---

[1] Defendant Davis affirms he locked Plaintiff's door before he departed the scene.  (Def. Exh. A, ¶ 19).  Defendant Vallejo attests Defendant Davis locked Plaintiff's door.  (Def. Exh. B, ¶ 14).

To help prevent the coercion of confessions by suspects, police officers must give <u>Miranda</u> warnings, which provide that a suspect has the right to an attorney and has the right to remain silent during interrogation.  <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 434-35, 120 S. Ct. 2326 (2000) (explaining the holding and purpose of <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966)). The rights guaranteed by <u>Miranda</u>, however, only apply to prevent coerced confessions during custodial interrogation.  <u>See</u> <u>Miranda</u>, 384 U.S. at 467 (explaining that when a suspect undergoes "in-custody interrogation," the suspect "must be adequately and effectively apprised of his [or her] rights").  In <u>Miranda</u>, the Supreme Court stated the following about the right to remain silent:

> Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

<u>Miranda</u>, 384 U.S. at 473-74.

The Fifth Amendment itself protects against self-incrimination in a criminal case.  <u>See</u> U.S. CONST. AMEND. V. <u>Miranda</u> warnings are procedural safeguards that protect suspects from making statements during custodial interrogation that can be used against them in later criminal proceedings. But, a violation of one's <u>Miranda</u> rights is not itself a violation of the Fifth Amendment.  <u>See</u> <u>Connecticut v. Barrett</u>, 479 U.S. 523, 528, 107 S. Ct. 828 (1987) (explaining <u>Miranda</u> warnings themselves are not required by the Fifth Amendment but instead serve a "prophylactic purpose"); <u>Oregon v. Elstad</u>, 470 U.S. 298, 306, 105 S. Ct. 1285 (1985) (stating "[t]he <u>Miranda</u> exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself.");

25

Michigan v. Tucker, 417 U.S. 433, 444, 94 S. Ct. 2357 (1974) (recognizing that the procedural safeguards required by Miranda are "not themselves rights protected by the Constitution").

The Court concludes that Plaintiff has not stated a Fifth Amendment violation because at the time he filed his civil rights complaint his criminal proceedings were still pending.  As such, Plaintiff had not claimed that self-incriminating statements were subsequently used against him in a criminal proceeding.  At best, Plaintiff has alleged a violation of his Miranda right to remain silent, which does not amount to a Fifth Amendment violation.  See Chavez v. Martinez, 538 U.S. 760, 770-72, 123 S. Ct. 1994 (2003) (holding that no Fifth Amendment violation occurred when an officer interrogated the plaintiff without first giving Miranda warnings because the plaintiff was never charged with a crime and the plaintiff's statements were never used against him).  Thus, Plaintiff has not stated a valid constitutional violation.

K.      City of Austin

Plaintiff sues the City of Austin.  However, a political subdivision cannot be held responsible for a deprivation of a constitutional right merely because it employs a tortfeasor; in other words a local government unit cannot be held responsible for civil rights violations under the theory of respondeat superior.  Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992).  The standard for holding a local government unit responsible under § 1983 requires that there be a custom or policy that caused the plaintiff to be subjected to the deprivation of a constitutional right.  Id; Collins v. City of Harker Heights, Tex., 916 F.2d 284, 286 (5th Cir. 1990), aff'd, 503 U.S. 115, 112 S. Ct. 1061 (1992).  Thus, the City of Austin  would violate an individual's rights only through implementation of a formally declared policy, such as direct orders or promulgations or through informal acceptance of a course of action by its employees based upon custom or usage.  Bennett v. City of Slidell, 728

26

F.2d 762, 768 (5th Cir. 1984), cert. denied, 472 U.S. 1016, 105 S. Ct. 3476 (1985).  In this case, Plaintiff has failed to identify a policy, practice or custom of the City of Austin that caused a deprivation of his constitutional rights.  Moreover, as discussed above, this Court has concluded Plaintiff has not established a violation of his constitutional rights, and the claims against the City fail for this reason as well.

### III.  RECOMMENDATION

The undersigned recommends that the District Court **GRANT** the Motion to Dismiss [#10], filed on behalf of the Austin Police Department, **GRANT** the Motion for Summary Judgment [#25], filed by Defendants the City of Austin, Davis and Vallejo, and **DISMISS** Plaintiff's claims brought against the defendants identified as unnamed officers at the Travis County Jail and other unnamed officers located downtown, and **DISMISS** as moot any remaining pending motions.

### IV. OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See 28 U.S.C. § 636(b)(1)(C);  Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct.

466, 472-74 (1985);  Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415, 1428-29 (5th Cir. *en banc*, 1996).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 31st day of May, 2007.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE